# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| : | |
| : | |
| : | |
| IN RE: ASTEA INTERNATIONAL INC. SECURITIES : | CIVIL ACTION |
| LITIGATION : | |
| : | NO. 06-1467 |
| : | |
| : | |

## MEMORANDUM AND ORDER

YOHN, J.                                                  August _____, 2007

This securities class action lawsuit was brought by several plaintiffs who represent the

class of investors that purchased the common stock of Astea International Inc. ("Astea") between

May 11, 2005 and March 31, 2006.  Plaintiffs allege that Astea, its Chairman and Chief

Executive Officer Zack Bergreen, and its Chief Financial Officer Fredric Etskovitz (collectively

"defendants") engaged in securities fraud in violation of section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.  Plaintiffs also assert the

liability of the individual defendants, Bergreen and Etskovitz, under section 20(a) of the

Exchange Act.

Currently pending before the court is defendants' motion to dismiss the consolidated

amended class action complaint ("complaint") pursuant to Federal Rules of Civil Procedure

12(b)(6) and 9(b), ("Rule 12(b)(6) and "Rule 9(b)," respectively) and the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  Defendants claim that

plaintiffs have failed to state with particularity facts giving rise to a "strong inference" that

defendants acted with scienter, as required under the PSLRA.  Defendants also argue that

plaintiffs' claims against Bergreen and Etskovitz must be dismissed because plaintiffs'

allegations of "control person" liability are derivative of plaintiffs' insufficient claims of securities fraud.  Also before the court is plaintiffs' motion to strike several exhibits attached to defendants' motion to dismiss or, in the alternative, to convert defendants' motion into a motion for summary judgment.

For the following reasons, plaintiffs' motion to strike certain exhibits attached to defendants' motion will be granted.  In addition, defendants' motion to dismiss will be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Background on Astea

Astea is a public company with software development at the core of its operations.  (Am. Consolidated Class Action Compl. ("Compl.") ¶ 29.)  It originally was incorporated in Pennsylvania in 1979 under the name Applied System Technologies, Inc., reincorporated in Delaware in 1995, and completed its initial public offering of common stock in July 1995.  (*Id.* at ¶ 24.)  Astea develops, markets, and supports service management software solutions.  (*Id.*)  Its software is used in industries such as informational technology, medical devices and diagnostic systems, industrial controls and instrumentation, retail systems, imaging systems, facilities management, and telecommunications.  (*Id.* at ¶ 26.)  On September 21, 2005, within the third quarter, Astea expanded its operations by acquiring substantially all the assets and certain liabilities of FieldCentrix, Inc., a mobility solution provider, in exchange for 421,106 shares of Astea stock, valued at $3,336,000.  (*Id.* at ¶ 67.)

### B.    Astea's Capitalization of Software Development Costs; Individual Defendants' Involvement in Astea's Accounting Process

On April 2, 2001, Astea announced in its 2000 10-K that it capitalized software

development costs in accordance with Statement of Financial Accounting Standards No. 86

("SFAS 86"), promulgated under generally accepted accounting principles ("GAAP").  (*Id.* at ¶

28.)  The 2000 10-K reported:

> The Company capitalizes software development costs subsequent to the establishment of technological feasibility through the product's availability for general release.  Costs incurred prior to the establishment of technological feasibility are charged to product development expense.  Development costs associated with product enhancements that extend the original product's life or significantly improve the original product's marketability are also capitalized once technological feasibility has been established.  Software development costs are amortized on a product-by-product basis over the greater of the ratio of current revenues to total anticipated revenues or on a straight-line basis over the estimated useful lives of the products (three to four years), beginning with the initial release to customers.  The Company continually evaluates whether events or circumstances have occurred that indicate that the remaining useful life of the capitalized software development costs should be revised or that the remaining balance of such assets may not be recoverable.  The Company estimates the recoverability of capitalized software based on the estimated future revenues of each product.

(*Id.*)  Since then, Astea has continued to report its adherence to SFAS 86 in its 10-Ks and 10-Qs.

(*Id.* at ¶ 29.)  SFAS 86, as explained by plaintiffs, "allows a company to capitalize certain costs

incurred in the development of software to be sold or otherwise marketed, instead of expensing

those costs in the present term."  (*Id.* at ¶ 30.)  After it establishes the "technological feasibility of

a product," a company can capitalize costs, such as wages for its development personnel and

overhead costs related to development, and amortize them over an extended period.  (*Id.*)

Deferring these costs until a product generates revenue allows a company to report higher net

earnings in the present.  (*Id.*)  Quoting SFAS 86, plaintiffs state that a product has reached the

point of "'technological feasibility'" if the company "'has completed all planning, designing,

coding and testing activities that are necessary to establish that the product can be produced to

meet its design specifications including functions, features, and technical performance

requirements.'"  (*Id.*)

Plaintiffs allege that an anonymous former controller stated Bergreen and Etskovitz were "intimately involved" in Astea's accounting processes.  (*Id.* at ¶ 32.)  In the complaint, the former controller, who reported directly to Etskovitz and had "frequent contact" with Bergreen,[1] describes the "routine process" of determining what portion of the period's software development expenses could be capitalized.  (*Id.*)  According to the former controller, each quarter "the Company's software development division would submit Excel spreadsheets containing schedules of expenses, including wages and overhead costs associated with particular products, to the accompanying department."  (*Id.*)  In addition, the development division "would also submit weekly timesheets that contained detailed information on the hours worked by specific development personnel on specific projects."  (*Id.*)  Next, the former controller would review and summarize the information for Bergreen and Etskovitz.  (*Id.*)  Then, the development managers, the former controller, Bergreen and Etskovitz would hold a teleconference call to discuss "in fine detail" which expenses could be capitalized and Bergreen would make the final decision.  (*Id.*)

In addition, plaintiffs allege that an anonymous former accounting manager corroborated the former controller's general description of Astea's capitalization accounting process.  (*Id.* at ¶ 33.)[2]  According to the former accounting manager, Astea tracked its software development costs

---

[1]The complaint does not specify when the former controller worked at Astea.

[2]The former accounting manager was responsible for budgeting, accounts payable and accounts receivable and forecasting.  (*Id.* at ¶ 33.)  Without specifying a time period, the complaint states that the former accounting manager reported to Astea's "then-current" controller, Maura Jennings.  (*Id.*)

using Excel and development managers would turn their employees' hour and wage information

over to the accounting department.  (*Id*.)  He also reported that once these costs were aggregated,

they would be capitalized for the specific period.  (*Id.*)

**C.      Allegations of Defendants' Materially False and Misleading Statements**

Plaintiffs claim that defendants made materially false and misleading statements

concerning Astea on six occasions during the Class Period.  To summarize, plaintiffs allege that

defendants understated expenses and overstated earnings, which artificially inflated the value of

Astea stock, by capitalizing certain costs in violation of SFAS 86.  (*Id.* at ¶ 34.)  Further,

defendants made several misleading statements regarding Astea's software capitalization

accounting and compliance with SFAS 86.  (*Id*.)  Astea's capitalization mistakes forced the

company to restate its earnings for the first three quarters of 2005 on March 31, 2006.  (*Id.* at ¶

34, 52.)  Its stock dropped from $16.50 to $11.73, a loss of nearly 30% in a single day.  (*Id.* at ¶

53.)

**1.      May 11, 2005 Press Release and Form 10-Q**

The first misstatements occurred on May 11, 2005, when Astea issued a press release

regarding its financial results for the first quarter ending March 31, 2005 and filed an 8-K signed

by Etskovitz with the SEC.  Astea reported revenues of $3.8 million and a net loss of $618,000.

(*Id*. at ¶ 35.)  Plaintiffs claim that defendants "sought to soften the impact of their disappointing

results for the first quarter of 2005" by attributing the quarter's decline to "a number of deals

being delayed, which contributed to the softness in license revenues" and "a number of larger,

enterprise deals that traditionally have longer sales cycles."  (*Id.* at ¶ 36.)  Bergreen stated that

"'[w]e remain confident in our ability to achieve our revenue goals for 2005 based on our strong

5

pipeline and the number of companies we are currently tracking.'"  (*Id.*)

Second, in a Form 10-Q filed with the SEC on May 11, 2005 and signed by the individual defendants, Astea reiterated the financials announced in the press release of that same date.  (*Id.* at ¶ 37.)  The May 11, 2005 10-Q restated Astea's capitalization of certain software development costs in accordance with SFAS 86.  (*Id.*)  It also reported that during the first quarter of 2004, Astea had revised the estimated life for its capitalized software products from three years to two years based on current sales trends and the rate of product releases.  (*Id.*)  It further stated that as of March 31, 2005, Astea's management believed that no revisions to the remaining useful lives or write-downs of capitalized costs were required.  (*Id.*)

In the May 11, 2005 10-Q, Astea also claimed that its Net Capitalization Software account as of March 31, 2005 was $1,618,000.  (*Id.*)  Further, Astea stated:

> Product development expense had increased 17% to $477,000 in the first quarter of 2005 from $408,000 in the first quarter of 2004 . . . . Capitalized  software totaled $350,000 in the first quarter of 2005 compared to $217,000 during the same period in 2004.  Product development as a percentage of revenues was 13% in the first quarter of 2005 compared with 7% in the first quarter of 2004.  The increase in percentage of revenues is the result of the continued effort of the Company to improve the quality and functionality of its products by adding more development staff, combined with the decreased sales volume.

(*Id.* at ¶ 38.)

The May 11, 2005 10-Q also disclosed that Bergreen and Etskovitz, together with Astea's management, had evaluated the effectiveness of Astea's controls and procedures regarding the company's reporting and disclosure obligations for that quarter, and that the company's controls and procedures were sufficient to relay material information to the individual defendants.  (*Id.* at ¶ 39.)  In addition, Bergreen and Etskovitz certified that pursuant to the Sarbanes-Oxley Act, the

10-Q did not contain any false and misleading statements.  (*Id.* at ¶ 40.)

Plaintiffs allege that the above statements contained in the May 11, 2005 press release and 10-Q were false and misleading because, as defendants later admitted in a March 31, 2006 press release and an April 4, 2006 8-K, Astea's earnings were "materially overstated" and Astea had failed to comply with GAAP in accounting for the capitalization of software development costs.  (*Id.* at ¶ 41.)

Plaintiffs also claim that the "disappointing results" for the first quarter of 2005 negatively impacted Astea's stock.  (*Id.* at ¶ 27.)  It fell from $9.50 per share on May 10, 2005 to $6.05 per share on May 11, 2005.  (Def.'s Mot. to Dismiss Ex. 11.)[3]

### 2.      August 10, 2005 Press Release and Form 10-Q

The third set of misstatements materialized on August 10, 2005, when Astea issued a press release regarding its financial results for the second quarter ending June 30, 2005 and filed an 8-K signed by Etskovitz with the SEC.  (Compl. ¶ 42.)  Astea reported revenues of $5.3 million compared to $4.4 million for the same period in 2004.  Astea also stated a net profit of $650,000 compared to $309,000 for the same period in 2004.  (*Id.*)  Plaintiffs claim that defendants sought to color Astea's first quarter financials as "a minor setback."  (*Id.* at ¶ 43.)  The press release quotes Bergreen positioning the company in "'a favorable position for today and in the future.'" (*Id.*)  Bergreen stated: "'Clearly, we are very pleased with our results in the second quarter and that we have translated our effort into a profitable position.'" (*Id.*)

Fourth, in a 10-Q filed with the SEC on August 10, 2005 and signed by the individual

---

[3]Exhibit 11 attached to defendants' motion to dismiss is a table of Astea's stock prices, a public record this court may consider in deciding the motion.  *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.* 998 F.2d 1192, 1196 (3d Cir. 1993).

defendants, Astea repeated the financials announced in the press release of that same date.  (*Id*. at

¶ 44.)  The company claimed the Net Capitalized Software account as of the end of the second

quarter was $1,770,000.  (*Id.*)  The second-quarter report also stated:

> Product development expense increased 29% to $927,000 in the first six months of
> 2005 from $721,000 in the first six months of 2004.  Gross development expense
> before capitalization of software costs was $1,665,000 for the first six months of
> 2005 compared to $1,281,000 for the same period in 2004. . . . Product development
> costs of $738,000 were capitalized in the first six months of 2005 compared to
> $560,000 during the same period in 2004.  The increase in software capitalization is
> a result of product development initiatives geared towards the next release of Astea
> Alliance.  Product development as a percentage of revenues was 10% in the first six
> months of 2005 compared with 7% in the first six months of 2004.  The increase in
> percentage of revenues is the result of the continued effort of the Company to
> improve the quality and functionality of its products by adding more development
> staff, combined with decreased sales.

(*Id.*)  The August 10, 2005 10-Q contained the same disclosures regarding Astea's control and

procedures that were reported in the May 11, 2005 10-Q, and Bergreen and Etskovitz again

certified the 10-Q.  (*Id.*)

Plaintiffs allege that the above statements contained in the August 10, 2005 press release

and 10-Q were false and misleading because, as defendants later admitted in a March 31, 2006

press release and an April 4, 2006 8-K, Astea's earnings were "materially overstated" and Astea

had failed to comply with GAAP in accounting for the capitalization of software development

costs.  (*Id.* at ¶ 45.)

Following the announcement of these results, Astea's stock rose, from $6.65 per share on

August 9, 2005 to $8.00 per share on August 10, 2005 but fell back down to $7.00 within one

week.  (Def.'s Mot. to Dismiss Ex. 11.)

     **3.**     **November 15, 2005 Press Release and November 14, 2005 Form 10-Q**

On November 15, 2005, Astea issued the fifth set of misstatements in a press release regarding its financial results for the third quarter ending September 30, 2005 and filed an 8-K signed by Etskovitz with the SEC. (Compl. ¶ 46.) According to plaintiffs, defendants "enthusiastically touted what appeared to be another successful quarter for Astea." (*Id.* at ¶ 47.) Astea reported revenues of $8.2 million compared to $4 million for the same period in 2004–a 106% increase. Astea also stated a net profit of $2.7 million compared to $155,000 for the same period in 2004. (*Id.* at ¶ 46.) The press release also announced the acquisition of FieldCentrix, which "immediately strengthen[ed] and further cement[ed]" the company's standing in a highly competitive marketplace. (*Id.* at ¶ 47.) Bergreen declared "'we have been able to not only maintain but thrive in this environment. We hold a very strong cash position and have absolutely no debt, which, is not common in the software industry today.'" (*Id.*)

The sixth set of misstatements was contained in a 10-Q filed with the SEC on November 14, 2005 and signed by the individual defendants, in which Astea reported the Net Capitalized Software account as of June 30, 2005 was $1,872,000. (*Id.* at ¶ 48.) The third-quarter report also stated:

> Product development expense increased 47% to $1,486,000 in the first nine months of 2005 from $1,012,000 in the first nine months of 2004. Gross development expense before capitalization of software costs were $2,562,000 for the first nine months of 2005 compared to $1,979,000 during the same period in 2004. . . . Capitalized software totaled $1,077,000 in the first nine months of 2005 compared to $968,000 during the same period in 2004. The increase in software capitalization is a result of product development initiatives and additional development personnel geared towards the release of the next version of Astea Alliance. Product development expense as a percentage of revenues was 9% in the first nine months of 2005 compared with 7% in the first nine months of 2004. The increase in cost is due to the continued effort of the Company to improve the quality and functionality of its product, which required adding more development staff. Additionally, the Field[C]entrix acquisition increased the Company's development staff and costs.

9

(*Id.*)

Plaintiffs allege that the above statements contained in the November 15, 2005 press release and November 14, 2005 10-Q were false and misleading because, as defendants later admitted in a March 31, 2006 press release and an April 4, 2006 8-K, Astea's earnings were "materially overstated" and Astea had failed to comply with GAAP in accounting for the capitalization of software development costs. (*Id.* at ¶ 49.)

After Astea announced its third-quarter results, plaintiffs point out that its stock price "soared," from $9.15 per share on November 14, 2005 to $12.84 per share on November 15, 2005. (*Id.* at ¶ 50.) According to plaintiffs, the one-day gain of nearly 40%[4] did not escape the attention of *MarketWatch.com*, which cited Astea as the top percentage gainer on the NASDAQ on November 15, 2005. (*Id.*) Moreover, Weiss Ratings, Inc. ("Weiss Ratings"), a stock analyst company, issued a report on November 16, 2005 that upgraded Astea from a "Sell" or "Hold" status to a "Buy." (*Id.*)

**D.    Astea Restates its Results for the First Three Quarters of 2005**

According to plaintiffs, "the truth emerge[d]" on March 31, 2006, when Astea issued a press release that announced that Astea would need to restate its earnings for the first three quarters of 2005 because it had failed to account properly for certain software costs (*id.* at ¶ 52):

> On March 29, 2006, the Company concluded that it had overcapitalized software in the first three . . . quarters of 2005. The net impact of quarterly restatements was an aggregate charge to earnings of $251,000, which amounts to ($.08) per share. The impact on quarterly earnings per share was a decrease to the first quarter of 2005 by $.04 to ($.25) per share, a decrease to the second quarter of 2005 by $.07 to $.15 per

---

[4]Elsewhere, plaintiffs report that Astea's stock enjoyed a "30%" surge in value. (*Id.* at ¶ 64.)

share, and an increase to the third quarter of 2005 of $.03 to $.94 per share.  The Company's Form 10-K, which is being filed today, reflects the restated quarterly results.  The Company plans to timely file a Form 8-K and Form 10-Q/A's with the SEC disclosing the quarterly restatements.

(*Id.*)  As plaintiffs explain the above figures, "the restatement was an admission that Astea had understated its net loss of the first quarter by $131,000, overstated its net income for the second quarter 2005 by $219,000, and understated its net income for the third quarter 2005 by $89,000 (although net income for the nine months ended September 30, 2005 was nonetheless overstated by $251,000)."[5]  (*Id.*)  The net impact of the quarterly restatement amounted to $.08 per share.  (*Id.*)  Plaintiffs allege that "on the heels of" Astea's press release, Astea's stock price fell nearly 30%, from $16.50 per share to $11.73 per share.  (*Id.* at ¶ 53.)  This drop in stock price also coincided with a 10-K filed by Astea with the SEC on the same day, in which Astea disclosed a major loss in net income – from $2,134,000 in 2004 to $1,828,000 in 2005.  (Def.'s Mot. to Dismiss Ex.1.)[6]

On April 4, 2006, in an 8-K filed with the SEC, Astea confirmed that, with the help of its independent auditors, its management and Audit Committee had determined that its prior accounting for software development costs required adjustment and that investors should no longer rely on its financial statements for the first three quarters of 2005.  (*Id.* at ¶ 54.)  Astea

---

[5]This compares with revenues of $17,378,000 for the entire nine-month period.  (*See* Def.'s Mot. to Dismiss 4-5 (citing Exs. 6, 7, 8).)  Defendants attach Astea's Amended Form 10-Qs for March 31, 2005, June 30, 2005, and September 20, 2005 as Exhibits 6, 7, and 8, respectively.  The Third Circuit has found evidence suitable for judicial notice includes documents filed with the SEC, *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002), thus I take judicial notice of these documents filed on April 20, 2006.

[6]I also take judicial notice of Astea's 2005 Form 10-K filed March 31, 2006 provided by defendants as Exhibit 1 to their motion to dismiss.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1331.

stated it had "overcapitalized software development costs in the first two . . . quarters of 2005 and undercapitalized software development costs in the third . . . quarter of 2005." (*Id.*)

The complaint contains several after-the-fact observations by the aforementioned former accounting manager, *see supra* note 2, who was "surprised" by Astea's restatement of its financial results for those quarters due to the overcapitalization of software development costs. (*Id.* at ¶ 33.)  The former accounting manager stated "'it's not as if the Company was a new Company–Astea knew it had to capitalize.'" (*Id.*)  According to the former accounting manager, if Bergreen and Etskovitz did not actually know about the software capitalization accounting errors, "'bottom line, [defendant Etskovitz] should have caught [the accounting errors giving rise to the restatement] because he is familiar enough with the industry.'" (*Id.*)

Plaintiffs also report that after this "shocking revelation," Weiss Ratings downgraded Astea to a "Hold" on April 21, 2006 and identified its weaknesses as "feeble growth in the company's earnings per share, deteriorating net income and disappointing return on equity" and the fact that "[r]eturn on equity has greatly decreased when compared to its ROE from the same quarter one year prior." (*Id.* at ¶ 55.)  Weiss Ratings did not mention the restatement of earnings in its analysis.  (Def.'s Mot. to Dismiss 7 (citing Ex. 12).)[7]

In summary, plaintiffs claim that the above material misrepresentations related to incorrect capitalization of certain software development costs in contravention of SFAS 86 violated § 10(b) and § 20(a).  Defendants have moved to dismiss both counts, challenging

---

[7]Defendants attach a complete copy of the Weiss Ratings report as Exhibit 12 to their motion to dismiss.  Because plaintiffs explicitly rely upon the Weiss Ratings report in the complaint, I may properly consider the entirety of this document without converting the instant motion into one for summary judgment.  *See Pension Benefit Guar. Corp.*, 998 F.2d at 1196.

whether plaintiffs have sufficiently pled the requisite scienter.  In response, plaintiffs filed a motion to strike several exhibits attached to defendants' motion to dismiss.[8]  I will first discuss the threshold procedural question raised by plaintiffs' motion to strike.  Next, because the liability of the individual defendants as controlling persons under § 20(a) are derivative of a § 10(b) violation, I will consider the merits of defendants' arguments that plaintiffs have failed to state a claim under § 10(b).  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999).

## II.    DISCUSSION

### A.    Plaintiffs' Motion to Strike Certain Exhibits Attached to Defendants' Motion to Dismiss

When ruling on a motion to dismiss, courts typically make their decisions based on "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Pension Benefit Guar. Corp.*, 998 F.2d at 1196.  Further, under Federal Rule of Evidence 201, courts may take judicial notice of a fact "not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned."  *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000).[9]  Otherwise, a district court may not consider matters extraneous to the pleadings.  *In re Burlington*, 114 F.3d at 1426.  A limited exception to this rule is that a "document integral to or

---

[8]In response to this court's request, the parties have also filed letter briefs addressing the impact of the Supreme Court's intervening decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 2007 U.S. Lexis 8270 (June 21, 2007).

[9]In the context of a motion to dismiss, the Third Circuit has found evidence suitable for judicial notice includes stock prices on the New York Stock Exchange, stock prices quoted on Quotron Chart services or documents filed with the SEC.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1331; *Ieradi*, 230 F.3d at 600 n.3.

explicitly relied upon in the complaint may be considered without converting the motion [to

dismiss] into one for summary judgment."  *Id.* (quotation omitted); *see also Pension Benefit

Guar. Corp.*, 998 F.2d at 1196.  This exception extends to "documents whose contents are

alleged in the complaint and whose authenticity no party questions."  *Pryor v. NCAA*, 288 F.3d

548, 560 (3d Cir. 2002) (quotation omitted).[10]

  Plaintiffs seek to exclude:  (1) two articles published in an accounting journal and one

law review article (Def.'s Mot. to Dismiss Exs. 2-4); (2) a transcript of an earnings conference

call held on March 31, 2006 (Def.'s Mot. to Dismiss Ex. 13); and (3) an Astea Quarterly

Newsletter accessible from the company's website (Def.'s Mot. to Dismiss Ex. 5).  Defendants

urge that these documents are indisputably authentic, "publicly available," and relevant to put

into context defendants' accounting errors and subsequent restatement.  Further, defendants

believe that the contents of the documents at issue are appropriate for judicial notice.

  While the parties do not dispute the authenticity of the documents and while they may

have some relevance to defendants' case, plaintiffs' claims are not based on the documents, nor

do they expressly rely on or allege the contents of the documents.  Additionally, defendants

confuse "publicly available" with "public record."  Articles published in accounting journals and

law reviews, conference call transcripts, *see J/H Real Estate Inc. v. Abramson*, 901 F. Supp. 952,

955 (E.D. Pa. 1995), and company web sites, *see Moore U.S.A. Inc. v. The Standard Register

Co.*, 139 F. Supp. 2d 348, 363 (W.D.N.Y. 2001), are not "matters of public record."  *See also*

---

[10]*Tellabs* does not alter what courts may examine when ruling on a motion to dismiss.
*See* 2007 U.S. LEXIS 8270, at *27 ("[C]ourts must consider the complaint in its entirety, as well
as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in
particular, documents incorporated into the complaint by reference, and matters of which a court
may take judicial notice.") (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)).

*Pension Benefit Guar. Corp.*, 998 F.2d at 1197 (noting that a public record includes criminal case dispositions, letter decisions of government agencies, and published reports of administrative bodies).  Moreover, as defendants proffer the documents to explain Astea's accounting mistakes and restatement, which plaintiffs implicitly challenge, their contents quite plainly are "subject to reasonable dispute," *Ieradi*, 230 F.3d at 600 n.3, and are therefore inappropriate for judicial notice.  *See Benak v. Alliance Cap. Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (upholding district court's judicial notice of newspaper articles for the fact of their publication and "not whether the contents of those articles were in fact true.")  Thus, these exhibits cannot be considered in deciding this motion.

**B.     Defendants' Motion to Dismiss Plaintiffs' Section 10(b) and Rule 10b-5 Claim for Failure to Plead Scienter Adequately Under the PSLRA**

Normally, when deciding a motion to dismiss pursuant to Rule 12(b)(6), the court is testing the sufficiency of a complaint.  *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir. 1980) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In making its ruling, the court must accept as true all well-pled allegations of fact in the plaintiff's complaint, and any reasonable inferences that may be drawn therefrom, to determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996); *Colburn v. Upper Darby Township*, 838 F.2d 663, 66–66 (3d Cir. 1988) (citations omitted).  "The issue is not whether [the claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997).  Courts will grant a motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v.*

*King & Spalding*, 467 U.S. 69, 73 (1984).

In addition, a securities fraud claim must satisfy the heightened pleading standards set forth by Rule 9(b) and the PSLRA.  *See In re Advanta*, 180 F.3d at 530.  Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge and other conditions of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  The Third Circuit has elaborated that "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue.'"  *In re Rockefeller Ctr. Props. Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington*, 114 F.3d at 1422).

The PSLRA dictates an additional "layer of factual particularity" for a securities fraud claim.  *In re Rockefeller*, 311 F.3d at 217.  Concerning fraud allegations, the PSLRA provides that a Section 10(b) claim must "specify each statement alleged to have been misleading, the reasons or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Moreover, with regard to the scienter element, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).[11] Significantly, if plaintiffs fail to allege facts supporting their claims of fraud with the requisite particularity, "they may not benefit from inferences flowing from vague or unspecific

---

[11]As the PSLRA's particularity requirement for scienter deviates from Rule 9(b)'s approval of general pleading, the PSLRA "supersedes Rule 9(b) as it relates to Rule 10b-5 actions."  *In re Advanta*, 180 F.3d at 531 n.5.

allegations–inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." *In re Rockefeller*, 311 F.3d at 224; *see Tellabs*, 2007 U.S. LEXIS 8270, at *32 ("[O]missions and ambiguities count against inferring scienter. . . .") (citing § 78u-4(b)(2)).

However, Congress did not further expound on the "strong inference" standard contained in the scienter element.  To resolve a divergence among the courts of appeals in construing the term, the Supreme Court endeavored "to prescribe a workable construction of the 'strong inference' standard, a reading geared to the PSLRA's twin goals:  to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs*, 2007 U.S. LEXIS 8270, at *26.  The *Tellabs* decision directs a reviewing court to:  (1) accept all factual allegations in the complaint as true; (2) consider the complaint in its entirety, including documents incorporated into the complaint by reference and matters of which the court may take judicial notice; and (3) "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" in determining whether the pleaded facts give rise to a "strong inference" of scienter.  *Id.* at **26-29.

Determining the strength of an inference is an "inherently comparative" inquiry.  *Id.* at *29.  The Supreme Court explained that the inference of scienter need not be irrefutable or the most plausible of competing inferences.  *Id.*  Rather, the inference "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id.* at **29-30; *see also Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, 2007 U.S. App. LEXIS 16353 (3d Cir. July 10, 2007).  A complaint will only survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at *30.

Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ."  15 U.S.C. § 78j(b); *In re IKON Office Solutions, Inc., Sec. Litig.*, 277 F.3d 658, 666 (3d Cir. 2002).  Rule 10b-5 enforces § 10(b) by creating "a private cause of action for investors harmed by materially false or misleading statements."  *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 147 (3d Cir. 2004).  Rule 10b-5 "makes it unlawful for any person 'to make any untrue statement of a material fact or omit to state a material fact necessary to make the statements made[,] in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'" 17 C.F.R. § 240.10b-5(b); *In re IKON*, 277 F.3d at 666.

The Supreme Court has instructed that the elements of a § 10(b) claim are

(1)      a material misrepresentation (or omission),
(2)      scienter, i.e. wrongful state of mind,
(3)      a connection with the purchase or sale of a security,
(4)      reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation,"
(5)      economic loss,
(6)      "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (citations and emphasis omitted)).  In this case, defendants focus on the second element, or scienter, i.e., "'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs*, 2007 U.S. LEXIS 8270, at *20 (quoting *Ernst & Ernst*, 425 U.S. 185, 193-94 & n.12 (1976)).

Plaintiffs may establish a "strong inference" of scienter:  "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts

18

that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington*, 114 F.3d at 1418 (quotation omitted); *In re Suprema*, 438 F.3d at 276 (quotation omitted); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (quotation omitted); *In re Advanta,* 180 F.3d at 534-35 (quotation omitted).[12]  As the *Tellabs* decision makes clear, the court's inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 2007 U.S. LEXIS 8270, at *27.

Under the first theory, motive and opportunity "must . . . be supported by facts stated 'with particularity' and must give rise to a 'strong inference' of scienter." *In re Advanta*, 180 F.3d at 535.  "Catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient." *Id*.  Rather, plaintiffs must allege "a concrete and personal benefit" to the individual defendants arising from the fraud. *GSC Partners*, 368 F.3d at 237 (quotation omitted).

A plaintiff may successfully demonstrate recklessness, the second theory, by pleading

> "[h]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

---

[12]The *Tellabs* court observed that while every circuit that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, the circuits differ on the degree of recklessness required. 2007 U.S. LEXIS 8270, at *20 n.3.  However, the Supreme Court did not address the issue of whether and when recklessness satisfies the scienter requirement. *Id.*  Thus, the *Tellabs* decision does not disturb the Third Circuit two-prong standard which permits a complaint to present a "strong inference" of scienter by means of motive and opportunity or recklessness allegations. *See, e.g., Globis Capital Partners*, 2007 U.S. App. LEXIS 16353, at *5 (applying pre-existing Third Circuit recklessness standard in a review of plaintiff's allegations of recklessness).

*SEC v. The Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir. 2000) (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979)).  The Third Circuit standard of recklessness is a demanding one, intended to ensure that "'the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.'"  *Globis Capital Partners*, 2007 U.S. App. LEXIS 16353, at **6-7 (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004)).

### 1.      Allegations Concerning Motive

Bergreen's and Etskovitz's opportunity to commit fraud is not disputed.  Rather, plaintiffs assert that defendants have four motives for making the allegedly material misrepresentations in order to inflate the price of Astea stock:

> [(1)] to protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; [(2)] to inflate the value of their personal holdings of Astea common stock and options and then profit by selling their holdings at artificially inflated prices; [(3)] to facilitate use of the Company's stock as currency for a corporate acquisition.  [(4)]  Furthermore . . . Defendant Bergreen has a history of instructing employees to book revenue prematurely and improperly in order to inflate Astea's financial results, which evinces a pattern of conduct wholly consistent with the fraudulent scheme alleged herein.

However, when these allegations are viewed holistically, even taking into account the additional allegations of recklessness, the reasonable inferences showing culpable motive are not as compelling as those showing innocent, but mistaken, behavior.

### a.      Individual Defendants' Incentive Compensation

Plaintiffs allege that Bergreen and Etskovitz received discretionary annual bonuses "based upon the achievement of earnings per share . . . targets."  (Compl. ¶¶ 61-62.)  Further, the complaint states that because the bonuses were tied to earnings per share, "[d]efendants had

every incentive to maximize (and inflate) the earnings per share date reported to the market."
(*Id.* at ¶ 63.)  Even when competing inferences are considered and these allegations are viewed
collectively, their general nature counts against inferring the requisite scienter.  *See Tellabs*, 2007
U.S. LEXIS 8270, at *32.  The Third Circuit has stated that "motives that are generally possessed
by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete
and personal benefit to the individual defendants resulting from this fraud."  *GSC Partners*, 368
F.3d at 237.  Increased officer compensation is a noted example of a motive allegation too
generalized to demonstrate scienter.  *GSC Partners*, 368 F.3d at 237; *see also In re Digital
Island*, 357 F.3d at 331; *In re Alpharma*, 372 F.3d at 152-53.  "On a practical level, were the
opposite true, the executives of virtually every corporation in the United States would be subject
to fraud allegations." *Tuchman v. DSC Commc'ns. Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994).

Plaintiff's allegation is that Bergreen's annual salary was increased to $250,000 with a
discretionary annual bonus of up to $50,000 as of January 1, 2005.  (Compl. ¶ 61.)  No allegation
is made as to whether this was an increase of 2%, 20% or 200%.  He was also to receive up to
$100,000 in annual bonuses "'based upon the achievement of earnings per share ('EPS')
targets.'" (*Id.*)  Again, no information is submitted as to whether this is an increase or a decrease
in prior compensation and the amounts are certainly moderate in today's corporate world.
Likewise, when Etskovitz became permanent CFO he received an annual salary of $200,000, up
to $40,000 in discretionary annual bonuses and up to $80,000 in annual bonuses "'based upon
the achievement of earnings per share ('EPS') targets.'" (Compl. ¶ 62.)  Again, no information is
given as to prior compensation and the amounts are moderate in today's corporate world.  There
is also no allegation with reference to the earnings per share targets established in the

employment contracts or the effect a $.08 per share difference would make in the amount of the annual bonuses. Moreover, since the erroneous capitalization extended only for a period of two years, any increased bonus that would have accrued in the first year would be lost in the second. Thus, plaintiff's allegations regarding Bergreen's and Etskovitz's compensation do not give rise to a strong inference of a mental state embracing intent to deceive, manipulate or defraud, i.e., a reasonable inference of scienter "cogent and at least as compelling as any opposing inference."

   **b.**  **Sales of Astea Stock**

  As additional evidence of scienter, plaintiffs allege that shortly after defendants misrepresented Astea's finances in the third-quarter press release and 10-Q, four company insiders, Bergreen, Etskovitz, John Tobin (President of Astea) and Eric Siegel (Director),[13] "took advantage of the surge in the Company's stock price." (Compl. ¶¶ 27, 64.) Plaintiffs claim that within a week of the company's third-quarter announcement, these insiders sold "over $1.6 million" in common Astea stock from November 18 to November 23, 2005. (*Id.* at ¶¶ 27, 65.)[14]

---

[13]The complaint does not name Tobin or Siegel as defendants.

[14]The actual gross proceeds, according to plaintiffs' own figures, total $1,540,288. In the complaint, plaintiff represents the insider sales of stock by the following chart:

| Insider | Shares Sold | Gross Proceeds | Date |
|---|---|---|---|
| Defendant Bergreen | 80,000 | $1,126,400 | November 23, 2005 |
| Defendant Etskovitz | 10,000 | $140,000 | November 22, 2005 |
| John Tobin, President of Astea | 10,000 | $135,200 | November 21, 2005 |
| Eric Siegel, Director | 1300 | $17,758 | November 21, 2005 |
| | 8700 | $120,930 | November 18, 2005 |

(*Id.* at ¶ 64.)

Plaintiff contends that these sales were "anomalous" as a none of the insiders had sold any Astea stock in the five years preceding these sales.  (*Id.* at ¶ 65.)  Plaintiffs further point out that Bergreen's realization of $742,504 in net proceeds equaled nearly three times his 2005 base salary of $250,000, and Etskovitz's realization was "an almost 50% premium" over his 2005 base salary of $184,423.  (*Id.*)  Finally, plaintiffs allege that the sales by Etskovitz and Tobin represented a roughly 40% reduction of their "holdings," while Siegel's sale equaled a more than 66% reduction of his holdings.  (*Id.*)  Notably, plaintiffs do not allege a percentage of reduction of Bergreen's holdings, nor do they disclose the net proceeds garnered by Siegel's or Tobin's sales.   Assessing these allegations collectively, I find that a reasonable person would not deem the inference of scienter at least as strong as any opposing inference.

The Third Circuit has stated that insider sales are not alone indicative of scienter.  *In re Advanta*, 180 F.3d at 540 (citing *In re Burlington*, 114 F.3d at 1424).  "Instead, plaintiffs must allege that the trades were made at time and in quantities that were suspicious enough to support the necessary strong inference of scienter."  *In re Burlington*, 114 F.3d at 1424; *In re Advanta*, 180 F.3d at 540.  Insider sales have been found "unusual in scope," *In re Advanta*, 180 F.3d at 540, based on a variety of factors, including "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved."  *In re Suprema*, 438 F.3d at 277 (citation omitted).  Other considerations include whether the sales were "normal and routine," and whether the trader received substantial profits in comparison to the trader's compensation.  *In re Burlington*, 114 F.3d at 1423.

Plaintiffs' claim concerning the scope of the sales gives rise to potentially opposing inferences; however, for the following reasons, a reasonable person would not deem the

inference of scienter at least as strong as any opposing inference.   First, although plaintiffs have alleged over $1.5 million dollars of gross proceeds,[15] "large dollar amounts, standing alone, typically do not suffice to establish motive." *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003).  Further, considering the context of the sales as described below, an aggregate gross sale of $1.5 million, which includes trading by *non-defendants*, is simply not large enough to show *defendants* acted with the requisite scienter.  *See Oran v. Stafford*, 226 F.3d 275, 289-90 (3d Cir. 2000) (stating that $40 million in stock sales at a profit of $24.98 million, in conjunction with defendants' trading habits, did not demonstrate a "strong inference" of scienter).  Additionally, Bergreen's and Etskovitz's ratios of profits to compensation do not rise to the level the Third Circuit found probative of scienter in *In re Suprema*.  There, one defendant's profits from his stock stale practically doubled in one day his total earnings from the previous three years combined.  *In re Suprema*, 438 F.3d at 278.  The other defendant's sales netted him four times his annual income.  *Id.*

Second, recognizing that stock options are an important part of compensation packages for many of today's corporate executives, the Third Circuit has, in some cases, declined to infer scienter from the sale of stock options.  *See, e.g., In re Advanta*, 180 F.3d at 541 ("Although the profits realized by the defendants were significant relative to their base salaries, these proceeds were the result of accumulated stock options and were an intended part of their overall compensation package.")  The SEC filings attached to defendants' motion to dismiss reveal that the sales by the individual defendants were based on the exercise of stock options.  (Def.'s Mot.

---

[15]Plaintiffs have not alleged net proceeds, but defendants point out that the aggregate profit totaled $829,650.  (Def.'s Mot. to Dismiss 9.)

to Dismiss Exs. 15, 16, 17, and 18.)[16]  In particular, the options exercised by Bergreen were awarded to him in 2001 "as compensation for a decrease taken in salary."  (Def.'s Mot. to Dismiss Ex. 14 at 8.)[17]  Further, even though Bergreen's profits were large relative to his annual salary, Bergreen exercised options which were due to expire in October 2006, and he did not sell any of his individually purchased shares during the class period.  (Def.'s Mot. to Dismiss Ex. 15.)

In addition, while plaintiffs state that Etskovitz and Tobin sold about 40% of their holdings and Siegel sold more than 66% of his "holdings," these allegations are based on alleged insiders' holdings of common shares and vested options only.[18]  Plaintiffs do not include unvested options as part of the alleged insiders' total holdings.[19]  Taking into account the

---

[16]Defendants have attached Bergreen's November 28, 2005 Form 4, Etskovitz's October 25, 2006 Amended Form 4, Tobin's November 22, 2005 Form 4, and Siegel's November 22, 2005 Form 4 as Exhibits 15, 16, 17, and 18 to their motion to dismiss.  I may take judicial notice of these documents filed with the SEC.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1331.

[17]Defendants have attached Astea's Definitive Proxy Statement filed on July 22, 2002 as Exhibit 14 to their motion to dismiss.  I may also take judicial notice of this SEC filing.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1331.

[18]Another court within this district has noted that while the Third Circuit has not explicitly addressed the question of whether to take into account exercisable stock options as part of a defendant's holdings when calculating the percentage of stock sold, it would be reasonable to include the stock options in light of the Third Circuit's recognition of options as a common form of compensation for corporate executives.  *In re Audible Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 25068, at *12 n.9 (E.D. Pa. Apr. 3, 2007).

[19]Plaintiffs assert that unvested options represent an "unrealistic part" of the alleged insiders' trading potential.  (Pl.'s Opp'n. 20 n.18 (citing *In re Silicon Graphics*, 183 F.3d at 986-87) (stating "actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone.").)  However, even if the unvested options could not be exercised with the class period, "the value of these options . . . whether vested or unvested, was necessarily tied to the market value" of Astea common stock.  *In re Digital Island*, 357 F.3d at 329 n.11.  Thus, plaintiffs' omission of the unvested options from the alleged insiders' holdings is somewhat perplexing in light of plaintiffs' claims that defendants schemed to manipulate the market to their advantage.  That said, no authority has explicitly addressed the

unvested options as represented in the Form 4s attached to defendants' motion to dismiss, Etskovitz's sale of 10,000 shares was a 18.9% reduction in his holdings.  (Def.'s Mot. to Dismiss 8-9 n.6, citing Ex. 16.)[20]   Thus, even though Etskovitz traded for the first time in five years within the class period, the fact that he retained a majority of his holdings, if this court were to consider vested and unvested options, weakens any inference of motive to commit fraud.

In the alternative, even without taking into account Etskovitz's unvested options, the individual defendants' aggregate sales nevertheless fail to raise a "strong inference" of scienter. The parties do not dispute that Bergreen reduced his holdings by less than 10% (Def.'s Mot. to Dismiss 8; Pl.'s Opp'n 20 n.17),[21] a minimal amount that weakens the possibility of motive.  *See In re Advanta*, 180 F.3d at 541 (finding no motive where two of the individual defendants sold only 7 percent and 5 percent of their stock).  Excluding unvested options, defendants calculate Bergreen and Etskovitz retained 93.86% of their aggregate holdings.  (Def.'s Reply 9 n.2).  "Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendants have sold significant percentages."  *In re Party City Sec. Litig.*, 147 F. Supp. 2d

---

question of whether to exclude unvested options from a defendant's holdings when calculating the percentage of stock sold.  However, whether or not unvested options are taken into account, the other circumstances of defendants' trading, particularly the timing of the trades, do not render the trades unusual enough to contribute to a "strong inference" of scienter.

[20]According to defendants' calculations including unvested options, the non-defendant sales are as follows:  Tobin's sale of 10,000 shares was a 20% reduction in his holdings, and Siegel's sale of 10,000 shares was a 43.5% reduction in his holdings.  (Def.'s Mot. to Dismiss at 8-9 nn.7-8 (citing Exs. 17, 18).)

[21]Plaintiffs do not allege a figure in their complaint, but in their opposition claim that the number is "less than 10%."  (Pl.'s Opp'n 20 n.17.)  Defendants point to Bergreen's Form 4 which states his sale of 80,000 shares was a 5.56% reduction in his holdings.  (Def.'s Mot. to Dismiss 8 n.5 (citing Ex 15).)

282, 315 (D.N.J. 2001); *see In re Advanta*, 180 F.3d at 541 ("Far from supporting a 'strong

inference' that defendants had a motive to capitalize on artificially inflated stock prices, [retained

holdings] suggest [that] they had every incentive to keep Advanta profitable."); *In re Silicon*

*Graphics*, 183 F.3d 970 at 987-88 (noting that where retained aggregate holdings of six officers

totaled 90%, no motive was pled by one officer's sale of 43.6%); *In re The Vantive Corp. Sec.*

*Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (finding that individual defendants' sales of 38% of

their aggregate holdings reduce the inference of scienter).  Moreover, two other directors,

Thomas J. Reilly, Jr. and Adrian Peters, did not trade any stock during the class period.  (Def.'s

Mot. to Dismiss 9 (citing Ex. 19);[22] Pl.'s Opp'n 19 n.15.)   The Third Circuit has declined to find

an inference of scienter based, in part, on the fact that "some key insiders sold no stock during

the class period."  *In re Alpharma*, 372 F.3d at 152 (citing *In re Burlington*, 114 F.3d at 1423 and

*In re Advanta*, 180 F.3d at 540-41).  In sum, these factors concerning the scope of the stock sales

weaken the inference that defendants acted with an intent to deceive, manipulate, or defraud.

Further, there are many plausible explanations for the timing of the sales of Astea

common stock that weigh against a finding of scienter.  The complaint alleges that the sales

occurred in late November 2005, after the third quarter announcement and approximately five

months before Astea reported its restatement in late March 2006.[23]   "A broad temporal distance

---

[22]Defendants have attached Astea's Definitive Proxy Statement filed on April 3, 2006 as Exhibit 19 to their motion to dismiss.  I may take judicial notice of this SEC filing.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d at 1331.

[23]Sales after defendants became aware of the need to restate earnings, but before the information was made available publicly, would obviously have different implications.  Here, there is no allegation that the individual defendants were aware of the accounting mistakes and the need to restate earnings as early as November of 2005.  Indeed, the allegation in Astea's 8-K filed April 4, 2006 that it had reviewed its accounting for capitalized software "in conjunction

between stock sales and a disclosure of bad news defeats any inference of scienter." *In re Party City*, 147 F. Supp. 2d at 313 (concluding sales of stock three, four and twelve months before the disclosure of bad news to be too attenuated to draw an inference of scienter); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) (noting sale of stock one month prior to date at issue raised "marginal" suspicion.)  Thus, a lapse of five months weakens the inference that the individual defendants were motivated to cash out before the company disclosed its restatement. Moreover, Astea's stock continued to rise after the third-quarter stock sales by Bergreen and Etskovitz in November of 2005, until it peaked at approximately $25 per share in February 2006. (Def.'s Mot. to Dismiss Ex. 11.)  Neither Bergreen, Etskovitz, nor any other insider traded Astea stock at any point within that five-month climb.  Rather, the insiders sold their shares for about $13 to $14 per share, at about half of the peak price.  *See In re Vantive*, 283 F.3d at 1093-94 (finding the inference of scienter weakened when one defendant sold most of his shares for "between $20 and $24 per share, when the price of the stock continued to increase in the several months following these sales, and ultimately peaked at $39").  Finally, plaintiffs cannot escape the fact that the timing of the sales occurred immediately after (as it was ultimately determined) Astea *understated* its earnings by $89,000 in the third quarter, which also raises doubt that defendants schemed to sell their shares at a ripe moment after having underhandedly controlled the market for the previous eleven months.   It is also very likely that defendants' stock sales following the positive third quarter results merely reflect compliance with securities law which prohibits insiders from trading on undisclosed information.  *See In re Party City*, 147 F. Supp. 2d

---

with the year-end audit of our financial statements by our independent auditor" (Compl. ¶ 54) suggests that awareness of the error occurred sometime after January 1, 2006.

282, 312 (D.N.J. 2001) (citing *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988)).  Thus, as plaintiffs' allegations do not show that the scope and timing of the sales of Astea common stock were unusual, these allegations, even when viewed collectively, fail to support a "strong inference" of scienter at least as compelling as any opposing inference of non-fraudulent intent.

   c.  **Acquisition of FieldCentrix**

    As further evidence of scienter, plaintiffs assert that Astea acquired FieldCentrix on September 21, 2005 in an all-stock transaction, and that at the time the transaction closed, Astea's common stock was valued at approximately $7.92 per share.  (Compl. ¶ 67.)  Further, the complaint alleges that "[a]bsent this artificial inflation, the Company would have had to pay more in Astea stock in order to complete the acquisition."  (*Id.*)  However, as these general allegations could be levied against any officer planning a corporate acquisition, plaintiffs ignore the requirement that scienter must be plead with particularity.  *See Tellabs*, 2007 U.S. LEXIS 8270, at *32. A corporation's desire to increase its stock value as part of an acquisition strategy is insufficient to establish motive.  *In re Alpharma*, 372 F.3d at 153 (citing, with approval, *In re Vantive*, 283 F.3d at 1097); *see also GSC Partners*, 368 F.3d at 237-38 (concluding that plaintiffs failed to assert scienter properly where plaintiffs asserted that a corporate acquisition, funded primarily by a $300 million note offering, would not have been successful if the company's true financial condition had been revealed); *In re Stonepath Group, Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 592 (E.D. Pa. 2005).  As plaintiffs fail to assert a "concrete and personal benefit" to Bergreen and Etskovitz arising from the FieldCentrix acquisition, I find that these blanket allegations count against inferring an intent to deceive, manipulate, or defraud.

### d.      Manipulative Conduct

Finally, as supporting evidence of scienter, plaintiffs allege that Bergreen's "history of instructing employees to book revenue prematurely and improperly in order to inflate Astea's financial results" shows "a pattern of conduct" to engage in the kind of fraud alleged in the complaint.  (Compl. ¶ 60.)  To buttress this allegation, plaintiffs cite statements made by a former Vice President of Astea.[24]  The former Vice President commented that Bergreen would "regularly" pressure him to accelerate the implementation process and insist on invoicing customers prematurely.  (*Id.*)  But, the complaint does not allege when or for how long the former Vice President worked at Astea or whether his interactions with Bergreen occurred during the class period.  Even though facts supporting an inference of scienter need not always be contemporaneous with the alleged misstatements, *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971-72 (N.D. Cal. 2005), the complaint has not made clear that Bergreen's undated conduct has any relevance to the accounting fraud alleged in this case.  *See id.* at 970 ("If misstatements alleged before the class period are relevant to [plaintiff's] case, then facts indicating the contemporaneous state of mind of the individuals making those alleged misstatements are as well.").  Thus, the former Vice President's observations are insufficient to raise a "strong inference" that Bergreen made the alleged misstatements at issue with the requisite scienter that is at least as compelling as any opposing inference.

Thus, accepting all factual allegations in the complaint as true, considering the complaint and the other appropriate documents in their entirety, and considering plausible nonculpable

_____

[24]The complaint alleges that the former Vice President served as a Director of Professional Services and a Director of Customer Service.  (Compl. ¶ 68.)  He reported directly to Bergreen and met with him twice a week.  (*Id.*)

explanations of defendants' conduct, I find that plaintiffs have not alleged that defendants acted with the required scienter, i.e., the intention to deceive, manipulate or defraud, such that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  Indeed, nothing in any of plaintiffs' motive allegations gives any specific information as to the allegedly fraudulent basis for the capitalization of the development expenses or as to the specific provisions of the purportedly violated SFAS 86 standard from which the court might be able to draw a "strong inference" of an intent to deceive, manipulate, or defraud.

### 2.     Allegations Concerning Conscious Misbehavior or Recklessness

Alternatively, a securities fraud plaintiff may establish a "strong inference" of scienter by alleging specific facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners*, 368 F.3d at 238 (quotation omitted).  Again, in the Third Circuit, a reckless statement involves "not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* at 239 (quoting *In re Advanta*, 180 F.3d at 535).

Plaintiffs claim that defendants consciously or recklessly disregarded the fact that the challenged public statements were either false or misleading when they were made.  (Compl. ¶¶ 58-59.)  Plaintiffs also assert that the individual defendants received "the true facts regarding the Company and its business practices" by their "control over" and "receipt of" the misstatements or their "associations with the Company which made them privy to confidential information concerning Astea."  (*Id.* at ¶ 59.)  Plaintiffs, however, have failed to plead particular facts

31

supporting their assertions that defendants consciously or recklessly committed fraud.  Thus,

reviewing these allegations collectively, even in connection with plaintiffs' other allegations

concerning motive, a reasonable person would not deem the inference of scienter at least as

strong as any opposing inference.

   According to the Third Circuit, "it is not enough for plaintiffs to merely allege that

defendants 'knew' their statements were fraudulent or that defendants 'must have known' their

statements were false."  *GSC Partners*, 368 F.3d at 239 (citations omitted).  In addition,

"[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions

within the company."  *In re Advanta*, 180 F.3d at 539 (citation omitted).  Notably absent from the

complaint are any contemporaneous facts that shed any light upon Bergreen's and Etskovitz's

state of mind with regard to the capitalization of Astea's software development costs to show

they consciously or recklessly disregarded the fact that the quarterly announcements were false.

The former controller and former accounting manager provide only general descriptions of the

"routine process" of Astea's capitalization accounting.  The complaint does not allege in any

greater detail that the former controller or former accounting manager observed any red flags that

the individual defendants deliberately ignored in the first three quarters of 2005 or whether the

individual defendants instructed them to violate corporate policy.  Plaintiffs' allegations rest on

generalized imputations of knowledge and a series of inferences which are too tenuous to

contribute to a "strong inference" that Bergreen and Etskovitz consciously misbehaved or

proceeded recklessly.  In short, plaintiffs have not demonstrated that defendants' capitalization

decisions were extreme departures from the range of reasonable business decisions, rather than

singular mistakes.

Plaintiffs' allegations suffer from an additional temporal problem that militates against a reasonable person finding a "strong inference" of scienter.  One factor that could be indicative of a conscious or reckless misstatement is the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information."  *Fidel v. Farley*, 392 F.3d 220, 232 (6th Cir. 2004) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)).  However, the last set of misstatements occurred in early November 2005, at the time of the third quarter announcement, and Astea revealed its accounting errors in a restatement over five months later in late March 2006.  This temporal difference between the alleged fraud and the later restatement gives rise to mere speculation and not a "strong inference."

In addition, mere violations of GAAP, without more, do not provide evidence of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994).  "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be satisfied."  *Novak*, 216 F.3d at 309.  Plaintiff must show "that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts."  *In re IKON*, 277 F.3d at 669 (quoting, with approval, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)).  Simplicity of the accounting decision is one of several factors to be examined in determining whether scienter is sufficiently pled.  *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 589 (D.N.J. 2005).  Other factors include "large magnitude of the misstated financials and the repetitiveness of the GAAP violations."  *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000).  In this case, plaintiffs give the court none of this information.

Plaintiffs merely claim that as a result of defendants' scheme to commit securities fraud,

33

Astea was forced to restate its earnings: "the restatement was an admission that Astea had understated its net loss for the first quarter 2005 by $131,000, overstated its net income for the second quarter 2005 by $219,000, and understated its net income for the third quarter 2005 by $89,000." (Compl. ¶ 52.)  Further, in their reply, plaintiffs argue that even though the determination of whether development costs should be capitalized is as difficult as defendants claim it to be, it is one that "[d]efendants have made many times during Astea's history as a public company." (Pl.'s Reply 17.)  The only factual support for this set of plaintiffs' allegations is a statement made by a former accounting manager who claimed that if Bergreen and Etskovitz did not actually know about the software capitalization accounting errors, "'bottom line, [defendant Etskovitz] should have caught [the accounting errors giving rise to the restatement] because he is familiar enough with the industry.'" (*Id.*)

However, these allegations do not establish that defendants' accounting decisions amounted to an "extreme departure from ordinary care." *See In re Advanta*, 180 F.3d at 535.  If anything, defendants' failure to apply SFAS 86 properly may constitute negligence or "little more than mismanagement."[25]  *See In re Alpharma*, 372 F.3d at 150.  But, "[c]laims essentially grounded on corporate mismanagement are not cognizable under federal law." *In re Advanta*, 180 F.3d at 540 (quoting *In re Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 638-39 (3d Cir. 1989)).  The slight magnitude of the misstated financials, or a net impact of eight cents per share compared to revenues of $17,378,000 and a net profit of $2,727,000 for the entire nine-month period (Compl. ¶¶ 48, 52; Def.'s Mot. to Dismiss 4-5), hardly invites the inference that

---

[25]Indeed, Astea's revision of its capitalization period from three to two years in the first quarter of 2004 (*see* Compl. ¶ 37) minimizes the effects of the alleged capitalization errors.

defendants made their business decisions recklessly.  Further, even though plaintiffs assert that defendants had made such capitalization decisions countless times, they have not alleged that the decision was a relatively simple one.  *See In re Bio-Tech.,* 380 F. Supp. 2d at 589 ("Plaintiff might have alleged recklessness by pleading facts demonstrating that the relevant guidelines for classifying costs as research and development were of such a simple nature as to cast serious doubt on Defendants' contention that they acted reasonably and in good faith.").  Plaintiffs also overlook the fact that defendants' restatement was a voluntary one.  *See In re Segue Software, Inc. Sec. Litig.,* 106 F. Supp. 2d 161, 169 (D. Mass. 2000) ("[A] restatement of earnings, without more, does not support a 'strong inference' of fraud, or for that matter, a weak one.")   The plausible nonculpable explanation for the voluntary restatement is that Astea made an accounting mistake and promptly corrected it.  In addition, the fact that the accounting error resulted in an understatement of net profit in the third quarter suggests that no improper motive was involved in the first and second quarter statements.  Without specific facts to demonstrate that defendants acted with conscious or reckless disregard of the truth, a reasonable person would not deem the inference of scienter at least as strong as the opposing inference of an innocent mistake.

Finally, contrary to plaintiffs' arguments, they have not stated anything close to the allegations constituting strong circumstantial evidence of conscious or reckless misconduct found adequate by the Third Circuit in *In re Suprema*.  While there are no brightline rules in determining the strength of an inference, the plaintiffs succeeded in pleading scienter in *In re Suprema* by citing, among other facts, the defendant officers' leadership of a very small senior management team with a "hands-on" relationship with customers, three of whom pled guilty to fraud and admitted they had created false invoices "'at the direction and with the participation of

35

Suprema's management.'" *In re Suprema*, 438 F.3d at 278. Thus, in this case, plaintiffs'

allegations of GAAP violations and of defendants' general involvement in Astea's accounting

procedure do not rise to the level of recklessness.

Thus, accepting all factual allegations in the complaint as true, considering the complaint

and the other appropriate documents in their entirety, and considering plausible nonculpable

explanations of defendants' conduct, I find that plaintiffs have not alleged "strong circumstantial

evidence of conscious misbehavior or recklessness," such that a reasonable person would deem

the inference of scienter cogent and at least as compelling as any opposing inference one could

draw from the facts alleged. Indeed, nothing in any of plaintiffs' allegations concerning

conscious misbehavior or recklessness gives any specific information as to the allegedly

fraudulent basis for the capitalization of the development expenses or as to the specific

provisions of the purportedly violated SFAS 86 standard from which the court might be able to

draw a "strong inference" of an intent to deceive, manipulate, or defraud. Because plaintiffs have

not succeeded in pleading scienter with the level of particularity required by the PSLRA, I will

therefore dismiss their § 10(b) and Rule 10b-5 claims.[26]

## C. Defendants' Motion to Dismiss Plaintiffs' Section 20(a) Claim

Section 20(a) states that "[e]very person who, directly or indirectly, controls any person

liable under any provision of this chapter or of any rule or regulation thereunder shall also be

liable jointly and severally with and to the same extent as such controlled person . . . ." 15

U.S.C. § 78t(a). Liability under § 20(a) is derivative of an underlying violation under the

---

[26]Since the complaint does not meet the stringent requirements of the PSLRA, this court "need not address whether it also fails to meet the requirements of [Rule] 9(b)." *In re Advanta*, 180 F.3d at 541 n.11.

Exchange Act. *In re Advanta*, 180 F.3d at 541. Because plaintiffs have failed to state a predicate claim under § 10(b) and Rule 10b-5, plaintiffs' § 20(a) claim is also dismissed.

## IV.   CONCLUSION

For the foregoing reasons, I will grant plaintiffs' motion to strike Exhibits 2, 3, 4, 5 and 13 from defendants' motion to dismiss. However, when all the allegations of scienter are accepted as true and viewed collectively and the plausible nonculpable explanations for defendants' conduct are considered, I find that a reasonable person would not deem the inference of scienter, i.e., an intent to deceive, manipulate, or defraud, cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Thus, because plaintiffs have failed to state claims under § 10(b), Rule 10b-5, and § 20(a), defendants' motion to dismiss will be granted. However, plaintiffs whose complaints are dismissed for failure to plead with particularity are given leave to amend their complaints. *See In re Burlington*, 114 F.3d at 1435. Plaintiffs, therefore, have an opportunity to amend their complaint within 30 days if they can do so consistently with this memorandum and with Federal Rule of Civil Procedure 11.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE: ASTEA INTERNATIONAL INC. SECURITIES | : | CIVIL ACTION |
| LITIGATION | : | |
| | : | NO. 06-1467 |
| | : | |
| | : | |
| | : | |

## ORDER

**AND NOW**, this _____ day of August, 2007, upon consideration of defendants' motion to dismiss for failure to state a claim upon which relief can be granted, filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (Docket # 9), and plaintiffs' motion to strike Exhibits 2, 3, 4, 5 and 13 attached to defendants' motion (Docket # 32), and all of the various responses and replies, **IT IS HEREBY ORDERED THAT**:

1.      Plaintiffs' motion to strike Exhibits 2, 3, 4, 5 and 13 is **GRANTED**;

2.      Defendants' motion to dismiss is **GRANTED** and plaintiffs' consolidated class action complaint is **DISMISSED WITHOUT PREJUDICE**.  Plaintiffs may file a second consolidated class action complaint, if they can do so consistently with this court's memorandum and the requirements of Federal Rule of Civil Procedure 11, within 30 days of the date hereof.  If they cannot file such a complaint, the consolidated class action complaint is dismissed with prejudice at the conclusion of the thirty day period without further action from the court.


        s/ William H. Yohn Jr.
        William H. Yohn, Jr., Judge